Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF KENTUCKY

FRANKFORT DIVISION

CASE NUMBER: 3:20-cv-00036


TONY RAMSEK, et al.,                    PLAINTIFFS,


        vs.


ANDREW BESHEAR, et al.,                 DEFENDANTS.




                    * * * * * * * *

DEPONENT:           STEVEN STACK, M.D.

DATE:               June 10, 2020

                    * * * * * * * *


LEE ANN GOFF

COURT REPORTER




                    B a r l o w
                 Raising the Bar
          Reporting & Video Services, LLC
               620 Washington Street
              Covington, Kentucky 41011
                  (859) 261-8440

1       The videotaped deposition of STEVEN STACK, M.D.,

2   taken for the purpose of discovery and/or use as

3   evidence in the within action, pursuant to notice,

4   heretofore taken via Zoom, on June 10, 2020, at

5   2:31 p.m., upon oral examination, and to be used in

6   accordance with the Federal Rules of Civil Procedure.

7

8                    * * * * * * * *

9                       APPEARANCES

10                       VIA ZOOM

11

12  REPRESENTING THE PLAINTIFFS:

13  Christopher Wiest, Esq.
    Chris Wiest, Atty at Law, PLLC
14  25 Town Center Boulevard
    Suite 104
15  Crestview Hills, Kentucky 41017
        and
16  Thomas B. Bruns, Esq.
    Bruns, Connell, Vollmar & Armstrong, LLC
17  4750 Ashwood Drive
    Suite 200
18  Cincinnati, Ohio 45241

19  REPRESENTING THE DEFENDANTS:

20  Wesley Duke, Esq.
    Taylor Payne, Esq.
21  Travis Mayo, Esq.
    Laura Tipton, Esq.
22  La Tasha Buckner, Esq.
    General Counsel, Commonwealth of Kentucky
23  700 Capital Avenue
    Suite 118
24  Frankfort, Kentucky 40601

25  ALSO PRESENT:  Tina Barlow, Videographer

Page 3

1                      I N D E X

2

3     Examination of STEVEN STACK, MD                    Page

4     BY MR. WIEST:                                         4

5     BY MR. DUKE:                                         82

6     BY MR. WIEST:                                        87

7     BY MR. DUKE:                                         98

8     BY MR. WIEST:                                        98

9

10

11                     E X H I B I T S

12

13    Exhibit                                            Page

14    Plaintiff's Exhibit Number 1                          5

15    Plaintiff's Exhibit Number 2                         15

16    Plaintiff's Exhibit Number 6                         26

17    Plaintiff's Exhibit Number 7                         30

18    Plaintiff's Exhibit Number 8                         39

19    Plaintiff's Exhibit Number 9                         47

20    Plaintiff's Exhibit Number 10                        49

21    Plaintiff's Exhibit Number 11                        50

22    Plaintiff's Exhibit Number 12                        63

23    Plaintiff's Exhibit Number 13                        67

24    Plaintiff's Exhibit Number 14                        75

25    Plaintiff's Exhibit Number 15                        78

Page 4

1                         STEVEN STACK, M.D.

2       called on behalf of the Plaintiff, after having been

3       first duly sworn, was examined and testified as follows:

4                         CROSS-EXAMINATION

5       BY MR. WIEST:

6           Q.   Just real quick, a couple housekeeping

7       matters.  We did enter some stipulations, the Judge

8       did sign off on those.  I've asked the court reporter

9       just to attach those to the record so the record is

10      clean.

11              Good afternoon, Dr. Stack.  My name is Chris

12      Wiest and, along with Tom Bruns, who is also on this

13      call, I represent the plaintiffs in the matter of

14      Ramsey vs. Beshear.  Two quick ground rules, and I'll

15      have a third ground rule for you in a couple minutes,

16      but -- and then we'll begin.

17              If you don't understand a question that I'm

18      asking, just ask me and I'll repeat it or rephrase

19      it.  But if you do answer it, we're going to

20      understand -- or presume that you understood it.  And

21      if you could listen to the question that I've asked

22      and answer it, we will get through this in fairly

23      short order, probably well short of the time that's

24      been allotted.  I do have another ground rule, but

25      I'm going to get into it in a couple minutes after we

1    do some introductory matters.

2            Your name is Dr. Steven Stack; correct?

3    A.    That's correct.

4    Q.    And you are the current commissioner of

5    public health for the Commonwealth of Kentucky;

6    right?

7    A.    I am.

8    Q.    And your background, as I understand it, is

9    in emergency medicine; right?

10    A.    Correct.

11    Q.    Can the court reporter go ahead and pull up

12    Exhibit 1, please?

13            (Plaintiff's Exhibit Number 1

14            was marked for identification.)

15            MR. WIEST:  All right.  Tina, can you scroll

16    down a little bit or zoom out?  That's blank.  Is it

17    showing for you?

18            COURT REPORTER:  No, it's blank here.

19            MS. BARLOW:  Yeah.

20            MR. WIEST:  This is a problem.  Can you try

21    to pull it up again?  Close it.

22            MS. BARLOW:  I am.

23            MR. WIEST:  Here's what I'm going to do:  I

24    can -- I think I can share a screen on mine.  Why

25    don't we try it that way?

Page 6

1           MS. BARLOW:  Okay.  Can you see this one?

2           MR. WIEST:  Yeah.  That I can see.

3           MS. BARLOW:  Is this okay?  Chris, are you

4      okay with this one?

5           MR. WIEST:  I -- all I see is your list.

6      That's what I see.  Let me try, Tina, and see if it

7      works from my end, if that's okay.

8           MS. BARLOW:  Okay.

9           MR. WIEST:  I'm going to share screen maybe.

10     All right.  Dr. Stack, can you see -- is that

11     showing?

12           THE WITNESS:  Yes.

13           MR. WIEST:  Okay.  That's how we'll do this

14     today then, that's fine.

15     BY MR. WIEST:

16       Q.   This is Exhibit 1, I've premarked it.  It's

17     an outline of the website from the Office of the

18     Commissioner.  Sir, it's got your biography on it.

19     Would you -- you agree with me that that is a fairly

20     accurate summary of your biography?

21       A.   To the extent that it -- for what it shows,

22     yes.

23       Q.   Okay.  And just to be clear, your background

24     is not related to epidemiology or, or virology;

25     right?

1    A.    I'm an emergency physician by background and

2    training who has extensive public policy experience

3    and other attributes that are described in that

4    biography and other places.

5    Q.    And I take it that, as an emergency room

6    doctor with your background, emergency room doctors

7    tend to be generalists, they -- they tend to be able

8    to handle whatever presents in the ER; right?

9    A.    Emergency physicians are acute care

10    specialists trained in the treatment of acute injury

11    and illness in an unplanned manner.

12    Q.    Okay.  Have you ever testified in a -- in a

13    deposition before?

14    A.    Yes.  But quite a long time ago and not

15    related to me personally.

16    Q.    Okay.  Were you an expert witness in that

17    deposition?

18    A.    No, I was a fact witness.

19    Q.    Okay.  Doctor, typically when experts give

20    opinions, they do so to a reasonable degree, in this

21    case, of medical certainty.  And I am going to be

22    asking you some -- this is the third ground rule that

23    we didn't get into before:  When I -- I'm going to be

24    asking you some questions that call for an opinion

25    today.  And when I'm doing so and when you answer, if

1    you can, I'd like you to give me your opinions to a

2    reasonable degree of medical certainty.  And if you

3    can't do that in response to any question, I'd ask

4    you to let me know that you're not able to do that.

5    Otherwise we're going to presume the default, as you

6    answer, is that you're, you're giving your answers to

7    a reasonable degree of medical certainty; is that

8    fair?

9        A.   Yes.

10       Q.   Okay.  We're going to be speaking today

11   about coronavirus and some of your public health

12   orders.  And I presume that you have not personally

13   conducted any studies in the laboratory or otherwise

14   on coronavirus; right?

15       A.   Correct.

16       Q.   In other words, as you've been formulating

17   recommendations and issuing orders related to the

18   coronavirus, you've been, I'm assuming, relying on

19   the input or studies that have been conducted by

20   others versus laboratory research that you personally

21   have conducted; right?

22       A.   Yes.

23       Q.   Okay.  As you've issued public health orders

24   or you've recommended others to do so related to the

25   coronavirus, would it be fair to say that your

1    primary objective is saving the lives of Kentuckians?

2        A.   Yes.

3        Q.   And as you've formulated public health

4    orders, you've issued them because the science and

5    medical studies support them; right?

6        A.   To the extent the science is known and

7    certain at the time.  The science and knowledge of

8    this disease is fast evolving, and so I have to make

9    decisions and recommendations upon my then-current

10   knowledge and understanding available to those who do

11   the job that I do.

12       Q.   And I take it as you've issued orders

13   related to activities or businesses, those have been

14   generated based on your assessment of risks and your

15   assessment of how to best minimize those risks of

16   spreading the coronavirus in terms of a particular

17   activity or a particular business; right?

18       A.   That's a fair statement.

19       Q.   Okay.  And would you agree that if people

20   violate your orders or those issued by the Governor

21   related to the coronavirus, it can lead to deaths?

22       A.   I believe if people choose a path of action

23   other than the ones I've recommended, they may

24   experience elevated risk of, of a bad outcome with

25   respect to their health and well-being.

Page 10

1        Q.   And a bad outcome could include death;

2   right?

3        A.   That is one possibility.

4        Q.   And I take it that other possibilities are

5   that they contract the coronavirus and they

6   experience symptoms which, you know, as we know,

7   there's a wide variation of symptoms depending on

8   individual patients; right?

9        A.   It could result in hospitalization, critical

10  care intervention in an intensive care unit,

11  mechanical ventilation, collapse of the respiratory

12  and circulatory system, or a number of other possible

13  consequences.

14       Q.   Would you agree with me that death rates are

15  higher in people with certain comorbidity require --

16  or comorbidity issues?

17            MR. DUKE:  I'm going to object to that

18  question -- this is Wesley Duke by the way -- as, as

19  kind of being out -- well, not kind of, but being

20  outside the scope of the order the judge issued in

21  regard to this deposition.  I don't know whether that

22  question has anything to do with the issue of the

23  difference between in-person protests and, and the

24  other activities under mass gatherings.

25            MR. WIEST:  Yeah.  And, and just for the

1          record, I've got to get to the background before I

2          get to the orders.  And all of this is going to lead

3          into questions about the orders, so I'm just laying

4          the groundwork, Counsel.

5                    THE WITNESS:  Mr. Wiest, could you repeat

6          the question for me?

7     BY MR. WIEST:

8          Q.    Yeah.  The -- you would agree that death

9          rates and, and negative outcomes are higher in people

10         or groups of people with certain comorbidity issues;

11         right?

12         A.    Yes.

13         Q.    And it's also been higher with certain

14         groups of people that have characteristics that are

15         known, kind of, risk factors for certain groups of

16         people; right?

17         A.    There are both known and unknown risk

18         factors.  To the extent that those are known, yes, we

19         have identified some that elevate your risk.

20         Q.    For instance, economically disadvantaged

21         people have seen higher death rates from coronavirus;

22         right?

23         A.    I wouldn't disagree with that, but I think

24         that the evidence is more clear for certain other

25         characteristics.

Page 12

1     Q.   And one characteristic, for instance,

2    certain minority groups, including African Americans,

3    have experienced higher death rates related to the

4    coronavirus; right?

5     A.   In Kentucky that is undeniably true.

6     Q.   I think we just talked about this, but

7    there's a lot of emerging science and a number of

8    studies that are coming out almost every day related

9    to the coronavirus; right?

10    A.   There's an enormous volume of research

11   coming available every day, yes.

12    Q.   Would you agree with me, as we look at the

13   research related to the coronavirus, that a

14   meta-analysis is the gold standard in terms of

15   medical research?

16    A.   I would not.

17    Q.   Okay.  Would you agree with me that a study

18   that is not peer reviewed would be the bottom rung of

19   kind of the research studies that are out there

20   related to the coronavirus?

21    A.   I would not -- not offer you an opinion

22   specifically on the relative weighting of the, the

23   various types of research.

24    Q.   Okay.  From what we currently know,

25   COVID-19, the novel coronavirus, is primarily spread

Page 13

```
1      by droplets from someone coughing, sneezing,

2      speaking, or shouting; right?

3          A.   Yes.

4          Q.   And Doctor, part of that -- I think we

5      should talk about this, but part of that

6      transition -- or transmission is when someone coughs

7      or speaks or sneezes or yells or sings, it projects

8      tiny droplets; right?

9          A.   Yes.

10         Q.   And then someone else, in terms of

11     transmission, would -- would essentially breathe that

12     in; right?

13         A.   It could come in contact with their eyes,

14     their nose, or their mouth, or it could be inhaled

15     into the respiratory tract.  All of those avenues are

16     common ways to receive those respiratory droplets

17     from another person.

18         Q.   And so being closer than six feet, for

19     instance, to someone else would make them more at

20     risk of receiving those droplets; right?

21         A.   The evidence supports that, yes.

22         Q.   And for instance, let me give you another

23     hypothetical.  If I were in the grocery store line

24     and, and waiting to go check out and someone were

25     behind me closer than six feet, but they sneezed or
```

Page 14

1      coughed into my back or in the back of my head,

2      that's less risky than being, say, face-to-face;

3      right?

4           A.    There's relative risk.  It depends on the

5      nature of the person who is standing near you,

6      whether they have infection or not, whether they have

7      a high viral load or not.  So there's a number of

8      different variables that, that determine the specific

9      risk in a moment of time.  To, to answer the general

10     question, any time that you are within proximity of

11     someone whose respiratory droplets can reach your

12     eyes, your nose, your mouth, or you can inhale them,

13     your risk of containing -- or contracting an

14     infection is elevated.

15          Q.    Is there more risk being face-to-face versus

16     my face to the back of someone's head?

17          A.    Again, it depends.  There -- whether you

18     are -- it depends on the environments and where you

19     are.  If you are face-to-face and you cough directly

20     at someone, that is a particularly high-risk

21     exposure.  If you are standing in front of someone

22     who has a high viral load and they cough, those

23     droplets can become aerosolized, suspended in the

24     air, and inhaled, and you can still have significant

25     risk.

1      Q.    Okay.   Doctor, there are some studies -- I
2    think there's something that just came out this week.
3    Are you aware of any research that suggests that
4    asymptomatic people are far less risky to spread the
5    coronavirus?
6      A.    No.   The jury is still out on that one,
7    quite literally.   There was some misunderstanding
8    from the World Health Organization earlier this week
9    that they have since stepped back from.   A New
10   England Journal article as recently as last week
11   raised the concern about asymptomatic spread and
12   perhaps that they could be as high as 40 percent of
13   cases.
14     Q.    Okay.   There are some other studies that
15   suggest that asymptomatic people are not as risky to
16   spread the coronavirus.   Are you aware of any of
17   those?
18     A.    As you've stated before and we established,
19   there's an incredible volume of research being
20   published daily, not all of which agrees with each
21   other.   And I am aware of various opinions related to
22   the likelihood, or lack thereof, of asymptomatic
23   transmission of this disease.
24            (Plaintiff's Exhibit Number 2
25             was marked for identification.)

Page 16

1       Q.    Okay.  Have you -- and I've just marked and

2   I've just shown you the first page of an exhibit,

3   it's Exhibit 2, related to asymptomatic spread of

4   coronavirus.  Have you seen this before?

5                MR. DUKE:  Mr. Wiest, we can't see that.

6                MR. BRUNS:  Chris, we still have --

7                MR. WIEST:  Let me do this, I think I need

8   to do a new share.  Maybe.  Here it is.

9                MR. DUKE:  Okay.  We have it.

10  BY MR. WIEST:

11      Q.    Have you seen and -- and again, this will be

12  in the record, but have you seen this study about

13  asymptomatic COVID, Doctor?

14      A.    I have not personally reviewed that

15  particular study.

16      Q.    Okay.  Doctor, some of the research that's

17  out there -- and I just want to know whether or not

18  you agree with this:  Is the highest risk for

19  coronavirus transmission through large groups of

20  people that congregate close together in indoor

21  settings?

22      A.    You used superlatives and those are not

23  going to be correct in all settings.  So there is

24  elevated risk for people to be in close proximity to

25  each other.  And when they do so in confined spaces,

1    because the air doesn't circulate usually as, as much

2    and there could be a higher concentration, there can

3    be elevated risk in an interior setting, so that

4    would be correct.  It is not necessarily the highest

5    risk situation, however.

6        Q.   Okay.  And I know that we've been looking at

7    some statistics.  For coronavirus deaths, as those

8    have been reported, what's being reported are people

9    who, who have passed away with a diagnosis of

10   coronavirus; right?

11       A.   Correct.  If you have a -- if you have a

12   diagnosis of COVID-19 at the time of death, it is

13   felt to be contributory to your cause of death.

14       Q.   Okay.  And unless we do an autopsy on

15   someone, we don't know whether or not coronavirus was

16   merely present or was an actual cause of death;

17   correct?

18       A.   As is often the case, a precise cause of

19   death is a professional medical determination that

20   requires judgment.

21       Q.   Okay.  And unless we do an autopsy, we don't

22   know whether or not coronavirus is an actual cause of

23   death or someone merely passed away with the virus;

24   right?

25       A.   No.  I would say an autopsy is not the

Page 18

1    determining factor.  It's possible with other

2    diagnostic studies such as CT scans, laboratory

3    studies, other radiographs.  It's possible via other

4    diagnostic tools to reach very compelling and more

5    certain diagnoses that don't, therefore, require an

6    autopsy for confirmation.

7        Q.   Okay.  And as, as numbers of corona -- as

8    deaths have been reported related to the coronavirus,

9    would it fair to say that most of the time that level

10   of analysis is not being conducted?

11       A.   It would be fair to say that autopsies are

12   not routinely being conducted, but it is quite common

13   that those other types of studies, CT scans,

14   laboratory studies, radiographs, physical

15   examinations, that those are being done with high

16   frequency related to people who expire from the

17   coronavirus.

18       Q.   And again, what -- the only thing that's

19   being reported though is you have the coronavirus and

20   you passed away; right?

21       A.   The -- in most states, or in all states as I

22   understand it, the cause of death is determined by

23   the treating physician on a death certificate.  And

24   they make their determination at that time based on

25   their best informed judgment and professional

1    experience, what the primary cause of death was and

2    what factors contributed to it.  So each treating

3    physician who declares or states a person's death has

4    to determine the causality between those different

5    contributing factors on the death certificate.

6        Q.   Doctor, would you agree with me that the

7    studies in terms of outdoor versus indoor suggest

8    that the risk of coronavirus spread is reduced in

9    outdoor settings?

10       A.   Depending on the nature of the interaction,

11   there is evidence to suggest outdoor settings can be

12   lower risk, all other things being equal.

13       Q.   Okay.  I'm curious -- here's another study

14   that's been out for a little while about the indoor

15   transmission of COVID.  And there are some

16   conclusions that they make that essentially and --

17   you know, I'm looking right here, I'm going to go

18   down to the punch line for you and for me, in which

19   they say that it does not rule out outdoor

20   transmission of the virus, but they suggest that in

21   terms of what they've studied, it is indoor

22   transmission primarily that they're seeing.

23            Have you seen this study before?  And I can

24   go back to the heading if you want to see it.

25       A.   I have not seen that particular study.

Page 20

1          Q.   Are you aware of any studies like it that

2     have reached similar conclusions in terms of risk

3     from outdoor versus indoor?

4          A.   Well, each study is unique.  And the

5     hallmark taught in medical school is the need to read

6     the Materials and Methods section to understand the

7     nature of the design of the study, which I have not

8     had the opportunity to do in this case.

9               Additionally, as I mentioned before, you

10    have to control a number of other variables to make

11    sure they're consistent over time.  So ten people

12    standing 20 feet apart indoors is safer than ten

13    people standing three feet apart outdoors.  In that

14    case I changed the distance between the individuals.

15              Ten people standing in silence next to each

16    other is different than ten people shouting or

17    singing next to each other in the same physical

18    space.  So there are many variables that have to be

19    accounted for, so without accurate time to review

20    this particular study, it would be difficult to

21    determine if I have an opinion on whether I can or

22    can't agree with their conclusions.

23         Q.   There are some studies out there that talk

24    about the wind dispersing the droplets in such a way

25    as to reduce the viral load outdoors.  Do you agree

Page 21

1    or disagree with that?

2         A.   In environments where there is more air

3    circulation and it diffuses the concentration of

4    viral particles and respiratory droplets, that would

5    be helpful to further reduce the likelihood of

6    infection, all other things being held equal.

7         Q.   Because the risk of infection does depend in

8    part upon the load, if you will, of the droplets that

9    someone is receiving; right?

10        A.   That is an important contributor, yes.

11             COURT REPORTER:  Hold on one second.

12             MS. BARLOW:  We have a Ms. Buckner that's

13   entering.  Is that okay?

14             MR. WIEST:  Yeah, that's fine.

15             MR. DUKE:  Yes.

16        (Ms. Buckner entered the deposition.)

17   BY MR. WIEST:

18        Q.   And I think you -- you've just acknowledged

19   this, Doctor, but I want to be clear, Harvard Medical

20   put out some guidance that stated, and I'm going to

21   quote it:  Outdoors, air currents are more likely to

22   scatter and dilute the virus, making transmission

23   less likely than in a home, office, or other confined

24   space with limited air circulation.  Do you agree

25   with that?

1          A.    I think that's a fair statement, again all

2     the other variables being considered.

3          Q.    I'm going to talk about -- we're going to --

4     we're going to talk about indoor and outdoor

5     gatherings in a minute, the -- but let's talk about

6     indoor first.  The coronavirus doesn't care if the

7     group of people are sitting next to each other in an

8     office conference room or on a church pew if they're

9     engaged in the same activity; right?

10         A.    Yes.

11         Q.    Okay.  And I suppose in some ways -- and I

12    think we've talked about this, but maybe the office

13    conference room could be a little more risky if

14    someone is facing someone else versus a church pew

15    where you're -- where you're facing the back of

16    someone.  Would you agree with that?

17         A.    Again you've given me a good opportunity to

18    explicate why those may or may not be similar risks.

19         Q.    Right.

20         A.    If someone is sitting in a, in a pew and

21    there's a concentration of people, if there's a more

22    dense concentration, the risk could be elevated even

23    if they're not face-to-face.  If the individuals are

24    singing in church, whereas they are silent or just

25    speaking in the office complex, the nature of singing

1       and projecting a greater volume over a greater

2       distance, the respiratory droplets could increase the

3       risk of spreading infection.  So again, unfortunately

4       there are many variables.  It depends whether or not

5       they are all similar across the different settings.

6       And, and each situation therefore would have to be

7       analyzed on its own merits.

8            Q.    Okay.  Doctor, the World Health Organization

9       has put out some guidance on social distancing.  And

10      they are suggesting one meter, which is three feet

11      and some change, as appropriate.  I know we've been

12      six feet in the United States and in Kentucky and

13      CDC.  Do you have any opinions about the World Health

14      Organization guidance on the one meter distance?

15           A.    I can offer you my understanding on this.

16      Typically it is felt, at least based on some research

17      done in the past, that in normal conversation

18      respiratory droplets may remain suspended in the air

19      for approximately three feet.  I believe that the CDC

20      added a margin of error to that, so they doubled the

21      distance to increase the likelihood there was a safe

22      distance and lower the risk of disease transmission.

23              In some situations the respiratory droplets

24      can go substantially farther than six feet if you are

25      shouting or screaming or singing loud or any of those

1    sorts of -- sneezing or coughing where you have

2    forceful expulsion of air.  So in this case it could

3    well be that the World Health Organization referenced

4    this specific research and that they said that three

5    feet is the distance beyond which it is less likely

6    you get exposed, and that a different public health

7    expert body has determined that adding a margin of

8    safety is in the best interest of public health;

9    hence we arrive at this CDC guidance of six feet,

10   which Kentucky has generally followed.

11        Q.   Doctor, I'm going to take about -- I want to

12   talk about face masks very quickly and then we're

13   going to get into -- because that's in some of these

14   orders and I want to talk about it.  And then we're

15   going to get into some other items and specifics of

16   the orders.  Are you aware of any research that

17   suggests that face masks can actually do more harm

18   than good?

19        A.   Well, the proper use of the face mask is

20   very important.  And the thinking on the face mask

21   has evolved over time.  The current thinking most

22   widely expounded upon for why we advise the use of

23   face masks, it's so that in the event someone has the

24   coronavirus infection and they are coughing or

25   talking or sneezing or laughing, that they don't

Page 25

1    spread it to other people.

2         So it is believed and it is felt that the

3    evidence -- the preponderance of evidence supports

4    that it reduces the transmission of the illness from

5    an infected person to someone else who may not be

6    infected.  As to whether it protects the wearer of

7    the mask themself from receiving infection from

8    others, the evidence is conflicting on how great the

9    value is to the person wearing the mask in protecting

10   them from receiving infection from others.

11        Q.  So said another way, the mask wearing is

12   about protecting the public and not the wearer;

13   right?

14        A.  Predominantly.  There is some -- there's

15   thought to be some benefit.  Obviously in the example

16   you've used multiple times, if you and I are sitting

17   across from each other in close proximity and talking

18   or, or shouting or singing at each other, or one of

19   us sneezes, if I'm wearing a mask, the -- the air and

20   the virus particles could theoretically get around

21   that mask, but it likely is going to catch on the

22   front of the mask the brunt of the respiratory

23   secretions you send my direction.  So it's felt there

24   is some protective value, but it is not the same as

25   the medical grade mask properly worn in a healthcare

1    setting.

2              (Plaintiff's Exhibit Number 6

3              was marked for identification.)

4       Q.    Okay.  Let's go -- we're going to look at

5    one quick study.  This is Exhibit 6 maybe.

6              Doctor, have you seen this study?  This is a

7    study on a cluster randomized trial of cloth masks

8    compared with medical masks in healthcare workers.

9    Have you -- have you seen or had the opportunity to

10   see this study before?

11      A.    Not this particular study, sir, no.

12      Q.    Okay.  And if this study were to conclude

13   that the use of cloth masks can actually increase the

14   risk of infection because people don't wash them --

15   they reuse them from day to day without washing them,

16   and people are not disciplined in their use, would

17   you have any reason to disagree with that?

18      A.     Well, I would but, but perhaps not for the

19   reason that you anticipate.  There is certainly a

20   risk that a mask not properly cared for or properly

21   used could expose the user of it or the wearer of it

22   to infection, but it would still have value in

23   keeping a person's contamination to themselves and

24   away from others.

25              And so determining whether the preponderance

1    of good or bad, you know, which of the two was more

2    dominant would really depend on the circumstances.

3    So your mask may be very dirty if you wear it, but as

4    long as I stay six feet away from you, and if you

5    cough it is still likely to keep me protected more

6    than if you are not wearing it.  It may not protect

7    you very well though if you don't care for it

8    properly and it picks up debris from other people.

9         Q.   Doctor, I'm going to turn to the context of

10   this case and some of the gatherings, and I want to

11   talk in the context of protests.  In a protest or, or

12   a gathering to protest, there's typically someone

13   talking to the group that's been gathered; right?

14   Someone's using a microphone; right?

15        A.   That's one form of protest, yes.

16        Q.   And then there's people that are gathered

17   around to hear them and possibly to speak or shout

18   back at them; right?

19        A.   Again, that is a common form of protest or

20   gathering.

21        Q.   And just to be clear, the coronavirus does

22   not differentiate based on the content of what is

23   being protested; right?

24        A.   The meaning conveyed by the verbal

25   utterances does not affect the transmission of the

Page 28

 1      viral particles.

 2           Q.   Okay.  And so if -- whether I'm protesting

 3      lockdown orders or I'm marching for Black Lives

 4      Matter, the virus makes no distinction in terms of

 5      the content of the protests; right?

 6                THE DUKE:  I'm going to object to that.

 7      Again, this is Wesley Duke.  And I know we had to lay

 8      the background to this, but I think this -- that

 9      question and this line of questioning is outside of

10      the scope of the judge's order in regard to the --

11      his direction on why we're here today.

12                THE WITNESS:  Should I proceed on that?

13                MR. DUKE:  Yes, sir.

14                THE WITNESS:  Okay.  So, Mr. Wiest, to your

15      question -- would you repeat that one more time?

16      BY MR. WIEST:

17           Q.   Right.  Whether you're protesting lockdown

18      orders or you're marching for Black Lives Matter, the

19      virus makes no distinction on the purpose of the

20      protest; right?

21           A.   The purpose of the communication or, or the

22      verbal utterances does not have bearing on the risk

23      of transmission of the disease.

24           Q.   If, if people are protesting and they stand

25      about six feet apart and they wear masks and the

Page 29

1    protest is outdoors, is that more or less risky than

2    sitting in a church pew six feet -- six feet apart

3    from the next family singing?

4        A.   Well, you've -- you've controlled the

5    variables.  So if people adhere to those variables,

6    meaning that they all stay six feet apart, that they

7    all keep their masks on at all times, if they engage

8    in similar behavior, the activities could in many

9    ways be similar.  Where they are not similar

10   necessarily is most churches don't have the capacity

11   to hold the number of people that could gather in an

12   outside space.  And any time you increase the number

13   of people who come together, you increase the

14   probability that infected people come in close

15   proximity with uninfected people, spread the disease,

16   and that they subsequently take that back to, to

17   their homes or to their other communities which may

18   be, you know, disparate.

19       Q.   Does it matter -- is the risk the same if

20   those people that have gathered for the protest stand

21   six feet apart, assuming that they do?

22       A.   Please clarify that.  When you say is it

23   similar, is it similar to what?

24       Q.   Well, I mean -- my, my question is:  If the

25   people at the protest are standing six feet apart

Page 30

1    from each other, if they're wearing masks, does it

2    really matter how many of them gather as long as

3    they're adhering to those protocols?

4        A.   Well, it does because all of these things

5    are risk-reduction strategies, none of them are

6    risk-elimination strategies.  There is no strategy

7    available, other than remaining in complete isolation

8    from each other until we find a prevention,

9    treatment, or cure for this disease, to effectively

10   keep everyone from becoming infected.  So any time

11   people come within proximity to each other, is a risk

12   of transmission of the disease.

13           And the recommendations that I have offered

14   have been ones that are risk-reduction strategies

15   that can lower the likelihood of disease

16   transmission.  And I think in follow-up or conclusion

17   to that, Mr. Wiest, if you bring together 5,000

18   people versus 50 people, the risk of infection

19   increases substantially simply because you have many

20   more people interacting with each other, where the

21   risk and the likelihood of transmitting disease

22   increases as a direct result.

23           (Plaintiff's Exhibit Number 7

24           was marked for identification.)

25       Q.   Doctor, I'm going to look at -- I'm going to

1    look at Exhibit 7.  It's the May -- oh, I'm sorry,

2    March 19th, and it was amended on May 9th, gathering

3    ban.  All right.  And I'm sure -- I'm going to just

4    scroll down real quick.  You are familiar with this

5    order because you signed it; right?

6        A.   I am familiar with this order.

7        Q.   And this order says all mass gatherings are

8    banned; right?

9        A.   Yes.

10       Q.   And it goes on to say, "Mass gatherings

11   include any event or convening that brings together

12   groups of individuals, including, but not limited to,

13   community, civic, public, leisure, faith-based, or

14   sporting events; parades; concerts; festivals;

15   conventions; fundraisers; and similar activities";

16   right?

17       A.   You appear to have read that correctly.

18       Q.   And then it goes on to say, "For the

19   avoidance of doubt, a mass gathering does not include

20   normal operations at airports, bus and train

21   stations, medical facilities, libraries, shopping

22   malls and centers, or other spaces where persons may

23   be in transit.  It also does not include typical

24   office environments, factories, or retail or grocery

25   stores where large numbers of people are present, but

Page 32

1      maintain appropriate social distancing"; right?

2          A.   You have reasonably read the next phrase,

3      yes -- its next line, yes.

4          Q.   Let me ask, first of all, what peer-reviewed

5      studies are you aware of that quantify the risk of

6      outdoor transmission versus indoor transmission, all

7      other variables being equal?  Sorry to back up on

8      you, but I needed to pin that down.

9          A.   Repeat that one more time for me, it was --

10         Q.   Yeah.  Are you aware of any peer-reviewed

11     studies that you're relying on that would quantify

12     the risk of outdoor transmission versus indoor

13     transmission, all other variables being equal?

14         A.   Well, I have read studies I don't have in

15     front of me here, but I have read, you know, academic

16     materials that have talked about the differential

17     likelihood of transmission inside, outside and, and

18     across many other factors that could contribute to

19     the spread of infection.  I, I don't have a specific

20     reference to offer you at this time though.

21         Q.   Okay.  Are you aware as you sit here today

22     of any research that exists showing outbreaks related

23     to outdoor activities?

24         A.   The answer is -- the answer is yes.  There

25     have been outbreaks that were related to outdoor

1    gatherings and outdoor events that have resulted in

2    the transmission.  And I would have no difficulty

3    finding those, though I don't have them in front of

4    me at the moment.

5         Q.   Okay.  I'm going to look -- and Doctor, I am

6    aware that there was an amendment to this order,

7    we're going to scroll down and look at it, this was

8    May 9th, that allowed for -- oh, let me back up.

9              What is the difference in outdoor

10   transmission rates versus indoor?

11        A.   Again, all -- all variables being held

12   equally, the outdoor transmission rate is probably,

13   you know, to some degree lower than the indoor

14   transmission rate because there's more air

15   circulation and other variables such as the sunlight

16   help to lower the risk.  But it does not eliminate

17   the risk.  And again, the nature of the interaction

18   between the people participating in the gathering,

19   whatever the nature of the gathering, also has direct

20   impact on the risk of infection and the spread.

21        Q.   Can -- can you quantify how much lower that

22   risk is outdoors versus indoors?

23        A.   I'm not aware of any, any accurate study

24   that can reasonably quantify that precisely.  But

25   directionally, and in a general sense, you know,

Page 34

1      publications and my understanding of those

2      publications has been that places where there is

3      greater air circulation such as an outdoor

4      environment can be lower risk.

5          Q.    Okay.  I want to -- this May 9th order that

6      allowed for the in-person worship, it did exempt

7      faith-based gatherings from the order, right, and it

8      put some conditions on those; correct?

9          A.    Yes.

10         Q.    And it explicitly carved out drive-in

11     services, right, from the -- from the order?

12         A.    Yes.

13         Q.    And one of the conditions -- and we're going

14     to look at it here in a second -- one of the

15     conditions that was put on worship was -- and by the

16     way, Doctor, we're going to look at some other orders

17     today and I see this a lot in the orders, 33 percent

18     of building occupancy capacity; right?

19         A.    Yes, I see that.  You have highlighted that

20     with the cursor.

21         Q.    Right.  And that is -- and that's for indoor

22     services; right?

23         A.    In this document, yes.

24         Q.    Okay.  Is there any limit on outdoor

25     services in terms of the number of people that can

Page 35

1    attend?

2         A.   Well, at the time that this document was

3    published, any mass gatherings were prohibited.  We

4    had not even excepted gatherings up to ten people at

5    that point.  So the only exceptions were very

6    specific situations and there were specific orders or

7    guidance documents written for those specific

8    situations.

9         Q.   Okay.  But just to be clear, this order on

10   churches does not have any size in the number of

11   people that can attend an outdoor worship service;

12   right?

13        A.   Well, but different criterion apply to the

14   outdoor service.  The outdoor service was a drive-in

15   service where people were in their own vehicles,

16   where they did not exchange items between

17   participants in other vehicles.  So the description

18   of the permissible activity was different in the

19   outdoor environment than it was in the indoor

20   environment.

21        Q.   Right.  Well, we look at -- there's a 33

22   percent of building occupancy capacity.  Do you see

23   that?

24        A.   I do.

25        Q.   There's no similar limit in terms of if

1    you're going to hold it in-person,

2    out-of-your-vehicle outdoors, there's no limit on the

3    number of people; right?

4         A.   Because each vehicle contains people from

5    only their household and there was no interaction

6    between the people in the different vehicles, and

7    therefore there was not the same requirement to, to

8    put the same type of physical distancing between the

9    vehicles because the vehicle itself served as the

10   barrier between other households.

11        Q.   No, I understand the vehicle and I want

12   to -- I want to step away from the vehicles and I

13   want to talk -- and I want to step away from the

14   drive-ins.  And I just want to look at, I'm going to

15   hold my church service in an outdoor environment, you

16   know, outdoor benches, amphitheater kind of

17   environment.  There's no limit that this order puts

18   on the number of people that can attend; right?

19        A.   Theoretically, if you have enough outdoor

20   space to contain vehicles that comply with the

21   requirements of an outdoor gathering, then you could

22   have a larger number of people, if that's what you're

23   asking.

24        Q.   Well, Doctor, there's nothing in this order

25   that prohibits or, or restricts people that are

1    outdoors from, from only doing it in their vehicles;

2    right?

3         A.    Was this the order that happened -- this was

4    the -- can you scroll up to the date on this for me,

5    sir?

6         Q.    Yeah, it was -- well, May 9th, and you can

7    also see the May 9th --

8         A.    Okay.

9         Q.    Yeah.

10         A.    Correct, so yes.  So this order was in

11    response to another court order where we amended the

12    previous guidance.

13         Q.    Right.

14         A.    We -- my advice, my preference would have

15    been at that point where we were still in phase one

16    of our reopening within the Commonwealth of Kentucky,

17    to have gatherings that did not have in-person, in

18    this particular route.  The courts determined that

19    this was to be permitted, and so then we had to

20    adjust our risk reduction guidance in an attempt to

21    reduce the risk as much as we could, permissible with

22    what the courts would allow.  So in this case, that

23    33 percent is an attempt to reduce the density of the

24    people within a confined space in order to further

25    reduce the risk of infection within what the Court

Page 38

1    would permit.

2         Q.   No, and, and Doctor, I'm not quibbling with

3    the 33 percent indoor.  My, my question is actually

4    related to people that are outdoors, that are out of

5    their cars in an outdoor -- what's called an outdoor

6    sanctuary setting.  There is no limit to the number

7    of people under this order that can attend an outdoor

8    worship service out of their cars, the 33 percent is

9    for indoor services only; right?

10        A.   This, this was -- yes.  I mean, this

11   document does not specify interior or exterior

12   gatherings.  This document was written with the

13   understanding that it was addressing people convening

14   within the confines of the church building itself.

15        Q.   Well, Doctor, there's no building occupancy

16   in an outdoor setting.  Building occupancy is for

17   indoor settings; right?

18        A.   I -- I'd accept that.  Yes.  Yes.

19        Q.   Okay.  Let's look at another order.  This

20   was another question that I had.  There is a lot of

21   shoulds; should limit, should ensure.  And in some of

22   your orders there are -- there are musts.  Are

23   shoulds recommendations and musts things that people

24   have to do, or can, can you -- can you elaborate or

25   explain that for me?

1      A.   I would say the use of the word must and the

2  use of the word should are -- were used in their

3  commonly understood interpretation, meaning that must

4  is something that we have a high expectation that you

5  comply with, and should is a strong encouragement

6  that this is a behavior that we strongly urge you to

7  take.

8      Q.   Okay.  And if we were going to enforce this

9  against someone, the musts would be the ones that if

10  you did it, you could have your business shut down or

11  -- and, and the shoulds are things you're just really

12  asking people to do because it's the right thing to

13  do and it's the safe thing to do; is that fair?

14      A.   I think in a general sense that that -- that

15  would be correct, that yes, that the musts are the

16  ones that a transgression of are the, are the ones

17  that are more likely to be enforced than the shoulds.

18  And that the shoulds, we would probably use education

19  as a tool to encourage people to follow those

20  behaviors.

21           (Plaintiff's Exhibit Number 8

22           was marked for identification.)

23      Q.   Okay.  I'll put up another one.  This is

24  Exhibit 8.  This is an order that came out May 22nd,

25  2020.  This is another order that I believe you

Page 40

1    signed and Secretary Friedlander signed; right?

2         A.    Yes, sir.

3         Q.    And I want to go down and, and look at

4    restaurants.  And if we look at restaurants, we see

5    again, and this is a theme, the 33 percent of

6    building --

7              MR. DUKE:  I want to go -- I'd like to make

8    an objection here.  This is Wesley Duke again.  This

9    order does not involve mass gatherings, and that's

10   what, once again, the scope of the deposition today

11   is about in-person protests and other mass gatherings

12   currently allowed.  This is a separate order that,

13   that -- that does not involve mass gatherings.

14             MR. WIEST:  Well, if you recall, Counsel,

15   the 6th Circuit directed us to compare and contrast

16   all of these orders in all of these contexts, which,

17   I mean, this is -- this is right on scope.  I

18   understand your objection; we're going to continue.

19   BY MR. WIEST:

20        Q.    Dr. Stack, this is another one, 33 percent

21   of building capacity.  Do you see that?

22        A.    I do.

23        Q.    I take it when we look at building capacity,

24   we know that if we're at capacity it's a very crowded

25   building; right?  If it's filled with people to

1    capacity; is that fair?

2        A.   I would -- in general terms, yes, I would

3    agree.  It depends how you define to capacity, but

4    yes, in common understanding, I would accept that.

5        Q.   Well, capacity is actually a legally

6    permitted building occupancy; correct?

7        A.   Right.  Now that you've defined that, if

8    you're following the legally defined building

9    capacity, then yes, if it is reaching that capacity

10   it is relatively full, yes.

11       Q.   Right.  And when you're using the term

12   maximum permitted occupancy, you're using the

13   building code understanding of that, or how many

14   people the fire marshal will allow in the building;

15   right?

16       A.   Yes.

17       Q.   And the -- you and Secretary Friedlander and

18   others have made the determination -- by the way, I'm

19   not questioning it at all -- that right now what is

20   okay is a third of that; 33 percent of that capacity

21   is okay in terms of how many people can be there,

22   subject to the requirement that whoever is there, if

23   you're not of the same household, you need to keep

24   six feet apart from, from other households; right?

25       A.   The only -- the only clarification I'd give

Page 42

1    is, I wouldn't say I'm okay with it; I'd say that we

2    permit it because it is necessary as part of a phase

3    one reopening.  Ideally from a public health

4    standpoint, we would like to keep people away from

5    each other so that they don't spread infection, but

6    there are counterbalancing considerations in society.

7    And, and so in this case, attempting to comply with

8    the general nature of guidance that the federal

9    government has afforded us and other states are

10   trying to do, we have allowed 33 percent of the

11   maximum capacity of a building in this case.

12       Q.   Okay.  You would agree that if people are in

13   different vehicles, automobiles, at the drive-in

14   service from different households, there's no risk to

15   a drive-in service, is there?

16       A.   There's very low risk.  I can never say

17   there's no risk, but I'd say it's very low risk.

18       Q.   Okay.  And that's why, for instance, out on

19   the highways if cars are, you know, bumper to bumper

20   in morning traffic going into or out of a city, I

21   mean, there's not really high risk for that activity

22   if people are in separate cars; right?

23       A.   I'd even agree with you that that is low

24   risk.

25       Q.   Okay.  When we look at the dining, and

1    that's what we're looking at here, there is some risk

2    to food being prepared; right?

3         A.   Yes.

4         Q.   And there's some risk to serving drinks;

5    right?

6         A.   Yes.

7         Q.   And let me ask, in terms of, you know, food

8    being prepared or serving drinks, is that -- is that

9    more risky or less risky than talking to someone

10   face-to-face?

11        A.   I would say again, my inclination is to be

12   helpful here, but it's also not to have you

13   misunderstand what I intend.  So when someone is

14   talking face-to-face, that is -- particularly when

15   they're not wearing a mask, that is a high-risk event

16   of transmitting COVID-19 if one of the two

17   individuals is infected.

18        It is lower risk, in my assessment, if

19   someone shares an object or -- between each other,

20   because transmission by contact surfaces is a lower

21   risk overall.  But it is not a risk-free exposure,

22   particularly when an infected person touches an

23   object and hands it immediately to another.

24        So in relative terms, handing an object from

25   one person to another is lower risk than talking

Page 44

1    face-to-face between an infected and noninfected

2    person.

3         Q.   We talked before about, you know, people in

4    separate cars being very low risk.  Is that risk,

5    from a public health perspective, an acceptable risk

6    from your standpoint, if it's a very low-risk

7    activity?

8         A.   Mr. Wiest, I'm --

9         Q.   Now --

10        A.   Can you repeat it or rephrase it?  I think I

11   understand it, but if you could repeat it or rephrase

12   it.  I'm trying -- trying to give you an accurate

13   answer to this.  And I want -- I want to be precise

14   in it because it's a good question, but I also want

15   to not have my answer be misunderstood.

16        Q.   Yeah.  At no time has the Governor or you

17   ever issued an order that says no one can drive in

18   automobiles because you might get close to someone

19   else.  And I think, you know, at the heart of that is

20   a recognition that the risk is so low as to be

21   acceptable to allow people to drive in their

22   automobiles on the highway.  Would you agree with

23   that?

24        A.   Well, I would agree that it is a weighted

25   risk-versus-benefit analysis for these different

Page 45

1    recommendations.  And in the case of driving in your

2    own automobile, the need for you to get from one

3    place to another to conduct your daily activities is,

4    is obviously important.  And the relative risk

5    counterbalancing that of acquiring infection or

6    spreading it is, is very low.  And so in that case

7    the analysis is not particularly difficult, it is one

8    where the evidence would clearly suggest that

9    driving, using your vehicle, is a reasonable

10   activity, weighing the risk versus the benefit.

11        Q.   And, and to be fair, I -- would you agree

12   with me that when we -- as we go through these

13   orders, there is a cost-benefit that you and perhaps

14   others are performing in all of these orders?  For

15   instance, restaurants, the benefit of having them

16   reopen perhaps from an economic perspective and other

17   perspectives warrants, you know, allowing that to

18   happen, subject to the 33 percent capacity.

19             In other words, as long as people keep under

20   that capacity of 33 percent and you're six feet away

21   from other people, the benefit outweighs the risks.

22   Would you agree?

23             MR. DUKE:  I'm going to object to that

24   question once again on being outside of the scope of

25   the order.

1        A.   Okay.  So I -- I would say that in any of

2    these decisions, I -- and when I offer my advice for

3    public health and safety, it is my intention to try

4    to keep people as safe as possible from a very

5    dangerous infection, the likes of which we've not

6    faced in a century.

7             This is an unprecedented challenge, that it

8    is a threat to humanity the world around.  So we've

9    not had this in any of our living memories.  And in

10   that calculus, I am appreciative of and cognizant of

11   the fact that there are very serious costs and

12   consequences that stem from these public health

13   measures.  And, and those are not lost on me in their

14   general sense, and they weigh heavily on me

15   personally as I make these recommendations.

16           In making the recommendations, we are

17   attempting to reduce the risk to a level that

18   protects people as well as we are able while

19   permitting them to engage in these human interactions

20   that are otherwise important in, in their conduct of

21   their daily lives.

22       Q.   Put another way, there -- there is a

23   cost-benefit analysis that you're engaging in as you

24   make these decisions; right?

25       A.   In, in some --

1          MR. DUKE:  I'm going to object to that.  I

2     don't know if that's a question; I think that's

3     testimony.

4          I think the question's been asked and

5     answered.

6     A.   Each time I make these recommendations, I

7     try to weigh the pros and the cons, the risks and the

8     benefits, and the relative costs associated.  And

9     recommend in balance what, what I feel is, is the

10    best balance I can achieve for public health safety

11    and, and other considerations.

12              (Plaintiff's Exhibit Number 9

13              was marked for identification.)

14    Q.   Thank you, Doctor.  Let's look at Exhibit 9.

15    This is another order -- I'm going to get it up here

16    in a minute maybe.

17         Doctor, this was an order that you actually

18    issued a little bit before the last one on May 11th.

19    And this was an order that allowed, among other

20    things, office-based businesses -- or maybe it was

21    Secretary Friedlander that issued this.  I think it

22    was.  I don't think you actually signed this, but I

23    want to look just very, very briefly at the

24    office-based setting, if I can get down to it.  There

25    we go.

Page 48

1          This had a restriction on it that provided
2     that not more than 50 percent of the employees be
3     physically present at the office any given day.  Do
4     you see that?
5          A.   I do.
6          Q.   But there was no limit at all in terms of
7     the number of people that could be present in an
8     office setting where it couldn't otherwise be
9     avoided.  And in that case it was the face masks and
10    six feet apart; right?
11          MR. DUKE:  I'm going to object to that.  I
12    will just -- my same objection as before, is that
13    these are not mass gatherings.
14          A.   So in this context, there is not a specific
15    limit described there.  Other documentation in force
16    at this time does describe that gatherings should be
17    kept to ten or fewer people.  So there is other
18    guidance on the Healthy At Work website that
19    describes, for areas where there is not specific
20    description, that ten or less is the gathering max.
21    But in this context, yes, it does say -- and that one
22    bullet does not specifically limit it to any
23    percentage or specific number.  It does, though,
24    require that there be face masks and the six feet
25    distancing between the individuals.

Page 49

1              (Plaintiff's Exhibit Number 10

2              was marked for identification.)

3      Q.    Okay.  I want to look at -- we're going to

4   go look at Exhibit 10.  Doctor, this was the -- I

5   know you -- I think you may have misspoken because

6   the, the order allowing ten people or more to -- or

7   ten or less to gather did not come in until May 20th;

8   right?

9      A.    And I think --

10              MR. DUKE:  I think that's --

11      A.    Well -- yeah, I think you're correct.  I

12   mean if that order preceded this, then you're

13   correct.

14      Q.    Okay.  And, and this was the order, and we

15   see it, ten people -- ten people or, or less are

16   allowed under this order; right?

17      A.    Yes.

18      Q.    Let me ask, Doctor, are you aware of any

19   case or study of -- evidence of COVID spreading from

20   the occupants of one car to another?

21      A.    I am not.

22      Q.    Okay.  As we look at this order, I want to

23   go and look at page, go -- we're going to go down and

24   look at page 7, actually.  Get there.  Got it.  Oh,

25   sorry.  There it is.

Page 50

1            One of the things that you recommend is to

2    "hold the gathering outside whenever possible";

3    right?

4        A.   Yes.

5        Q.   And, and the reason -- I think we covered

6    this -- is because, all other things being equal,

7    outdoor gatherings are less risky than indoor

8    gatherings; correct?

9        A.   Generally, yes.

10       Q.   Okay.  And again, this is the church

11   order -- or the church guidance has not changed,

12   either, since May 9th; is that fair?

13       A.   I don't believe it has.

14       Q.   Okay.

15       A.   I'd have -- I'd have to look.  As you'll

16   appreciate, my memory is, you know, has its limits

17   and there's a lot of activity taking place.

18            (Plaintiff's Exhibit Number 11

19            was marked for identification.)

20       Q.   No, I understand.  And I'm trying -- I think

21   we're going to get you out of this deposition early

22   actually, Doctor, at the rate that we're going, so

23   that's good.

24            I want to look at Exhibit 11 very quickly.

25   Doctor, this was an order that you just issued, just

Page 51

1    about a week ago, on June 3rd, 2020.  And I'll show

2    you -- that's your signature; right?

3        A.    Yes, sir.

4        Q.    And I specifically want to go down and look

5    at auctions; okay?  And one of the things that this

6    says is if you cannot do it remotely, you have to do

7    it outside to the greatest extent practicable; right?

8        A.    Yes.

9        Q.    And again, the reason for that is, as we've

10   previously established, is that outdoor gatherings

11   are less risky, all other things being equal, than

12   indoor gatherings; right?

13       A.    Yes.

14       Q.    Now, there is a restriction on the number of

15   people, but only if it's done indoors.  And in that

16   case, if it's done indoors, it's 33 percent of the

17   maximum permitted occupancy of the facility; right?

18       A.    Yes.

19       Q.    But for outside, it is six feet away from

20   each other and the auctioneers or staff; right?

21       A.    That's what it says, yes.

22       Q.    Okay.  And when we're looking at outdoor

23   auctions, essentially as many people as they can fit

24   in the space are allowed to attend; right?

25       A.    There is no upward limit stated in this

Page 52

1    document.

2         Q.   Okay.  And in an -- in an auction, the

3    auctioneer is speaking or yelling to the crowd as

4    he's soliciting bids; correct?

5         A.   That's my understanding of an auction,

6    that's typically done, yes.

7         Q.   And the crowd is bidding by yelling back

8    their bids; right?

9         A.   Or raising a paddle or some other

10   methodology.

11        Q.   Right.  Yet there's no requirement that

12   they -- that they bid silently by paddle; right?

13   They're allowed to yell back at the auctioneer under

14   this order; correct?

15        A.   This document does not specify it, I don't

16   believe.

17        Q.   Okay.  And the staff -- the staff are

18   required -- I'm going to show you it here in a

19   minute.  The staff have to wear face masks or face

20   coverings if they're within six feet of someone else,

21   but there's no requirement that the crowd do so;

22   correct?

23        A.   Well, it states that the auctions may

24   require customers to wear masks, but it does not

25   mandate that the auctions must enforce the customers

Page 53

1     to wear masks.

2          Q.   And I just want to -- from a COVID risk

3     spreading perspective, there's no difference between

4     100 or, or let's just take a larger number -- 500

5     people at an auction or 500 people at a protest, is

6     there?

7          A.   Well, those activities can be very different

8     from each other.

9          Q.   Well, I'm going to ask you why in a second,

10    but in both cases people are shouting back and forth;

11    right?

12         A.   Well, not to the same extent or in the same

13    nature.

14         Q.   Again, I'm --

15         A.   So I think -- I think that the, the

16    likenesses you're trying to draw, really it depends

17    on the individual activity itself.

18         Q.   You're saying how the protest is conducted

19    or how the auction is conducted; right?

20         A.   Well, correct.  So, you know, as you've

21    talked about the different types of auctions,

22    thinking of a popular movie, Lara Croft:  Tomb

23    Raider, where there's an auction scene right in the

24    movie and they raise paddles and no one speaks except

25    for the auctioneer.  And the auctioneer is not

Page 54

1    shouting, the auctioneer is talking.

2         Q.   Right.

3         A.   So that auction is very different from the

4    type of auction we've already described as one

5    possibility.  Just, just as other auctions or, or

6    protests can take different shapes and forms.

7         Q.   Well, let's look at the worst-case auction

8    that's permitted under your order, Doctor.

9    Worst-case auction, we've got people shouting back

10   and forth at the auctioneer; right?

11        A.   In one -- yeah, in worst-case scenario, I

12   guess you could have the entire attendance of the

13   auction shouting back at the auctioneer.

14        Q.   Right.  And, and in a worst-case protest,

15   you could have the entire protest shouting back and

16   forth, you know, with the protest leader; right?

17        A.   You could.

18        Q.   And in both cases, there may not be a good

19   way to ensure absolutely, perhaps, that, that social

20   distancing be enforced if the crowd is large enough;

21   right?

22        A.   It could be that when you bring together

23   large numbers of people, it can be difficult to

24   enforce rules of any sort.

25        Q.   Right.  And there's no limit under this

Page 55

1    order in terms of the number of people that can

2    attend an outdoor auction; correct?

3        A.   I can't see the whole order, but I'll just

4    say, yes, I -- I don't -- don't believe we specified

5    any upward max.

6        Q.   There's no limit for the amount of time that

7    the outdoor auction can take place; correct?

8        A.   Not in this document, there is not.

9        Q.   All right.  You previously, I think, were

10   going to -- and I want to allow you to answer the

11   question.  How is this worst-case auction with a

12   large crowd any different than a -- than a protest?

13       A.   So I -- again, I will have to give you

14   illustrative examples to demonstrate the various ways

15   they could be different.

16       Q.   Yeah.

17       A.   So --

18       Q.   Yeah, and I want to focus in on the worst

19   case, where people are shouting back and forth in the

20   auction center.

21       A.   I understand.  If you are conducting an

22   auction, you often can have a way to record who's in

23   attendance.  You may sell a ticket, you may know

24   who's present.  You may have a way to identify or

25   locate or follow those people if there's a problem.

1    If you are attending an auction, it is an organized

2    event in the sense that generally they can tell you

3    that these are the conditions under which you can

4    participate in the activity.

5         In fact, in this particular order it

6    empowers the, the organizer of the auction to exclude

7    people from participation if they -- if the auction

8    organizer requires masks and the individuals coming

9    don't choose to wear them, they can exclude those

10   individuals and decline to provide them that

11   activity.

12        That is -- again, it is not that a protest

13   could not be organized in similar fashion, but many

14   protests are not organized in such similar fashion.

15   There generally are not tickets sold, there are not

16   people who are recorded in person as to who is there

17   and who is not.  The, the nature of the activity is,

18   has more informality in people coming and going, and

19   the intensity of passion, even though there are

20   intense auctions I am sure, is frequently not the

21   same across the events.

22        Which makes one event, meaning the auctions,

23   more likely to be amenable to control efforts.  And

24   another event, meaning the, the protest or public

25   expression of opinion and that, that type of venue,

1    more difficult and less likely to be controlled, or

2    control.

3             I will offer you a different example since

4    I've used a popular movie as one example.  Watching

5    the television coverage just from this past weekend,

6    one can see the intensity of feeling people have

7    when, when expressing themselves in a protest about

8    deeply held beliefs.  And then you can see examples

9    where individuals are embracing police officers with

10   neither person having a mask and close physical

11   contact occurring.  In that setting, even with the

12   best of intentions, the nature of the activity lowers

13   the likelihood of compliance with rules set out in

14   advance.

15        Q.   So as I understand what you're saying -- and

16   I'm going to go back and, and look at this -- there

17   is no requirement that an auction record who was

18   present under your orders; right?

19        A.   Not in this specific order, but if you are

20   going to bid on an item, generally they have a way to

21   identify who you are, because if you successfully

22   secure the bid you have to pay for the bid you've

23   won.

24        Q.   Sure.  That, that is true.  There's nothing

25   that keeps protestors from recording the protest

1    itself and, in fact, you would agree in the age of

2    social media that often does, in fact, occur; right?

3         A.   There's no prohibition about people taking

4    attendance at a protest.  I'm not familiar that that

5    is the typical way in which protests are held.  And I

6    -- and I would offer, Mr. Wiest, that the prohibition

7    is against mass gatherings, it's not specifically

8    against protests.  The, the prohibitions have been

9    against people coming together in large volumes where

10   the risk of transmission of disease and infection is

11   markedly elevated.

12        Protests are only one of those forms, and

13   they are certainly not the only form of mass

14   gathering that is prohibited under these orders.

15   These, these other orders that you are showing with

16   me in these guidance documents, if you will, are

17   essentially exceptions to that rule where we are

18   attempting to permit activities that society has

19   expressed its need to engage in in a way that we have

20   tried to mitigate or reduce the risk as best we are

21   able to.

22        And as I no doubt think you've also

23   observed, that the condition continues to change as

24   we acquire more evidence, more scientific

25   understanding, and hopefully have some confidence

Page 59

1     that we are finding ways to control disease spread so

2     that we can permit the public to engage in as many

3     activities as possible with the least necessary risk

4     incurred.

5          Q.   Okay.  Have you made any recommendations to

6     the Governor in terms of permitting protest activity?

7               MR. DUKE:  I'm going to object to that on

8     the grounds of executive privilege.

9          A.   Am I still required to answer?

10               I have made recommendations only to the

11     general nature and extent of mass gatherings.  The

12     extent that I have offered specific guidance is

13     embraced in these guidance documents where I have

14     made recommendations or -- and worked with teams of

15     individuals to recommend certain situations where

16     larger numbers of people may gather under these, you

17     know, specified conditions.

18          Q.   And is there anything -- I guess let me ask

19     it a more simple way because this -- I think our

20     judge in the 6th Circuit is going to need the answer

21     to this.  Is there anything in the works to permit

22     protest activities?

23          A.   I don't have any specific guidance on a lot

24     of different types of activities, including protest

25     activities.  The -- to give you the frame of

Page 60

1     reference, we have defined generally May to be the

2     phase one reopening, June to be the phase two.  And,

3     and should we not experience a resurgence of disease

4     or, or overwhelming of the healthcare system, phase

5     three would begin on June 29th, at which point it is

6     our proposal to allow gatherings of up to 50 persons

7     and at which point we have received proposals for

8     various other activities.  And if the proposals

9     fulfill the general nature of the guidance that we've

10    requested, we have, you know, granted acceptance for

11    some of those proposals after, you know, on or after

12    the date of June 29th.

13         Q.   Doctor, you would agree with me that if a

14    protest activity occurs and someone were to encourage

15    the protestors to stand six feet apart and to wear

16    masks unless they're currently speaking, that would

17    be a far safer protest than if people are not doing

18    those activities; right?

19         A.   Well, the only distinction I would give it

20    would be it's safer.  I -- you, you've qualified it

21    with, you know, "far safer."  It would be a -- it

22    would be a safer and a lower-risk environment if they

23    complied with the six feet distancing and the

24    universal mask.

25         Q.   And would it be about on par with handling

1    an outdoor auction in which people are speaking and

2    yelling back and forth in the context of conducting

3    an auction?

4        A.   I don't know that I can give you that

5    because again we've, you know, I've tried to explore

6    how those different guide -- those different

7    situations are different, but I would say that to the

8    extent that mass gatherings occur, if people adhere

9    to the six-foot distance in all directions, wearing

10   masks, and also using proper hand hygiene, those --

11   those are considered to be three of the most

12   important measures we can advise to minimize the

13   spread of infection.  I would say the nature of the

14   gathering -- or the purpose of the gathering, let's

15   say that, not the nature.  The purpose of the

16   gathering, to me, is largely immaterial.  It's the

17   nature of the gathering, how people interact with

18   each other at it.

19       Q.   Okay.  Just out of -- just curious.  This is

20   the racetrack provision that was in the same order.

21   And apparently no media, no crowds are permitted

22   currently; right?

23       A.   In the current order, yes.

24       Q.   Okay.  If -- and I'm just -- just curious.

25   If you were to allow that to occur but with

Page 62

1    distancing of six feet between customers, is that any

2    less risky or more risky than, than the auction?

3         A.   Are you talking about if fans were

4    permitted?

5         Q.   Yes, sir.

6         A.   I would state -- and I will give you an

7    example now.  There was a belief that Mardi Gras in

8    February in New Orleans where a million people

9    gathered in a largely outdoor environment was

10   considered to be a high risk for the spread of the

11   disease.  And in 1918 when Philadelphia hosted a

12   parade in the middle of the Spanish influenza

13   epidemic, that has been well substantiated to have

14   been a super-spreading event increasing the risk of

15   transmission of disease.

16        So I would state that my general public

17   health preference would be to not have mass

18   gatherings of any sort for any reason, but that human

19   commerce and social engagements have been

20   counterbalancing pressures that have compelled us to

21   have to permit certain activities that are, while not

22   free of risk, we can try to take steps to recommend

23   interventions that will lower the risk.

24        So whether it be a space -- a space track --

25   I'm sorry -- a racetrack or whether it be an outdoor

1  concert or whether it be a protest, for me, the fact

2  that we bring large numbers of people together during

3  a pandemic of -- caused by an infection for which we

4  have no vaccine, no cure, and no effective treatment,

5  are all risks that have to be balanced against the

6  competing benefit society is seeking to obtain from

7  them.  And we will do our best to advise the public

8  about what those risks may or may not be and steps

9  they can take to mitigate those risks as best we and

10  they are able.

11      Q.   So Doctor, I know that you -- I mean your,

12  your business is assessing the risk.  Are you the one

13  who is also making the call on the value of a

14  particular activity or is that something that others

15  are also involved in?

16      A.   I don't think I make a value determination

17  specifically on the activity.  I make a determination

18  about the relevant risk of the activity itself.  And,

19  and then in the decision of these things I make my

20  recommendations, and then others have multisource

21  input from other advisors that have to determine

22  where the relative risk and benefit weighting may

23  lie.

24          (Plaintiff's Exhibit Number 12

25            was marked for identification.)

Page 64

1      Q.   I want to look -- we're going to look at

2    some photos right now.  And I think -- this is

3    Exhibit 12, and we're going to go through a bunch of

4    these.  I will represent to you, although I think

5    you're going to recognize it, that these are a bunch

6    of photos of the Capital area, the lawn -- the lawn

7    area.

8              Doctor, you've been to the Capital; right?

9      A.   A few times.

10             MR. DUKE:  I want to object to the relevance

11   of this line of questioning.  I think it's outside

12   the scope of the order.

13             MR. WIEST:  It's going to be real relevant

14   in two questions.

15             MR. DUKE:  I'll still lodge my objection.

16             MR. WIEST:  No, I understand.

17   BY MR. WIEST:

18     Q.   Doctor, you would agree with me that the

19   Capital itself is a -- there's a lot of open space

20   there; correct?

21     A.   There's a fair amount of grassy, open space

22   at the Capital, yes.

23     Q.   And I will tell you we got on the City of

24   Frankfort's GIS and we were able to measure square

25   feet about the front porch of about 201,851 square

Page 65

1    feet, and the back porch area of 68,946 square feet.

2              MR. DUKE:  I'll lodge my same objection as

3    to the relevance of this question and ask that -- I

4    don't know how Dr. Stack can answer as to --

5              MR. WIEST:  Well, yeah, I'm going to ask him

6    a hypothetical based off of it.

7    BY MR. WIEST:

8         Q.    But Doctor --

9              MR. DUKE:  Note my objection.

10        Q.    -- you have no reason to quibble with those

11   square footage calculations; right?

12        A.    I, I don't -- I don't dispute these but then

13   again, I also don't validate them --

14        Q.    No, you --

15        A.    -- so we can use them for the sake of your

16   discussion.

17        Q.    Right.  Would you agree with me that if

18   people were to stand in this 200 -- approximately

19   200,000-square-foot area, spread apart six feet

20   between households with masks on, that we could, you

21   know -- and assuming we could accommodate about a

22   thousand people doing that, is that a high-risk

23   activity or a low-risk activity, Doctor?

24        A.    I would say, as I've said repeatedly

25   already, any time you bring large numbers of people

Page 66

1    together during the middle of a pandemic with an

2    easily spread infection for which we have no

3    successful intervention, it is a high-risk activity.

4    There are steps you can take to lower that risk or

5    mitigate the risk.  In this instance being outdoors

6    is helpful, the fact that -- if you were to be able

7    to keep people six feet apart from each other, it's

8    helpful.

9            But it's also very possible you've contrived

10   a hypothetical that has no bearing on what the

11   likelihood of reality will be.  In this case, if you

12   bring together people who are passionate, wildly

13   vocalizing on a topic, and moving around in a

14   free-flowing event, it is highly unlikely they will

15   stay in their six-square-foot box.  And so I would

16   say that a mass gathering of any sort remains

17   undesirable in the middle of a pandemic.  In this

18   particular case you are describing an activity that

19   is hypothetically possible but realistically

20   difficult, I think, to provide.

21      Q.   You're saying the risk mitigation measures

22   of keeping people six feet apart may be difficult; is

23   that what -- is that correct?

24      A.   Yes.  And also when you're outdoors that

25   is -- that is helpful for lowering the risk of

1    transmission of disease, but it is harmful to the

2    compliance with mask use given the heat of standing

3    out in the open sun and the discomfort associated

4    with wearing a mask under those conditions.

5         Q.   Is sunlight an effective virus killer, do we

6    know?

7         A.   There is evidence that ultraviolet radiation

8    decreases the duration where a virus will -- you

9    know, for which a virus is alive and, and, you know,

10   infective.  So ultraviolet light is hopefully -- it's

11   felt to be generally helpful in lowering the duration

12   of time the virus will remain viable.

13        Q.   And I take it that this is one of these

14   emerging areas of science that we don't have all the

15   answers on yet?

16        A.   It is, because this particular virus has not

17   been around long enough for all the studies that will

18   be conducted.  But, but in general viruses are less

19   durable, if you will, under the beating sunlight

20   because of the ultraviolet radiation.

21             (Plaintiff's Exhibit Number 13

22             was marked for identification.)

23        Q.   Okay.  We're going to look at another

24   exhibit.  Just issued this order.  This was the June

25   8th order and specifically I am going down to page

Page 68

1      14.  Oh, by the way, Doctor, that is your signature

2      on it; right?

3          A.   Yes, sir.

4          Q.   Okay.  All right.  This is the requirement

5      for libraries, distilleries, zoos, and wineries;

6      right?

7               MR. DUKE:  I'd like to lodge my objection

8      right now as these -- those activities that were just

9      described are not mass gatherings and, therefore,

10     outside of the scope of the order.

11         Q.   Well, let's talk about that.  Doctor, you

12     would agree a mass gathering is anything that brings

13     together a group of people in a confined area -- over

14     ten people; right?

15         A.   Mr. Wiest, that's an interesting question

16     because the federal guidance documents have described

17     various numbers.  Groups of up to ten, groups of up

18     to 50, and groups of over 250.  And there's this gap

19     between the 50 to 250.  But by any measure, it is

20     felt that a gathering greater than 250 is a large

21     gathering.  Some would call it a mass gathering.

22     Under 250 is still a large gathering.

23               And, and so there is some differences

24     just -- you know, judgment or definition in some of

25     those terms.  But when you bring together groups of

Page 69

1     people larger than 250, I think most people would

2     consider that a large gathering.  And, and quite a

3     few would also label it, in the middle of a pandemic,

4     as a mass gathering, though I recognize outside of a

5     pandemic that is not a terribly large gathering for

6     what people would normally do if there were not a

7     highly contagious pathogen spreading throughout the

8     community.

9         Q.   And, and just to go back to the church

10    requirements of the, of the 33 percent building

11    capacity, we could easily get more than 250 people

12    inside, you know, some of the larger churches;

13    correct?

14        A.   I think that's probably possible, yes.

15        Q.   And looking at the auction environment, we

16    could easily get over 250 people attending an outdoor

17    auction; correct?

18        A.   I can imagine that would not be difficult to

19    achieve in many settings.

20        Q.   And so here we're looking at, for instance,

21    zoos.  Let me ask, Doctor:  Have you been to the

22    Louisville Zoo?

23        A.   I have not.

24        Q.   Have you been to the Lexington Zoo?

25        A.   Do we have a Lexington Zoo?

Page 70

1          Q.   Well, let me --

2               MR. DUKE:  Hold on.

3          A.   I'm not familiar that we have one.

4          Q.   I've not been there.  Let me -- let me just

5     back up.  Zoos can fit over 250 people, can they not?

6          A.   I -- yeah, I would believe most public zoos

7     could hold more than 250 people.

8          Q.   Large public libraries can fit over 250

9     people; right?

10         A.   Oh, I've seen libraries that can't, but

11    yeah, there's large -- large public library could

12    hold more than 250 people at its full, allowable

13    capacity, yes.

14         Q.   Right.  As the -- some of these others, the

15    Speed Museum, the Kentucky History Center, they can

16    fit over 250, can they not?

17         A.   It should be a matter of fact.  I mean I

18    don't -- if they can, they can.  If they can't, they

19    can't.  I just haven't been to all these places.

20         Q.   Okay.  Assuming that they can, the only

21    requirement that we've got is -- and let's go look,

22    it's six feet between households; right?  Especially

23    for outdoors.

24         A.   And they still have to follow the healthy

25    work guidance for gatherings of up to ten people.

Page 71

1       Q.    Okay.

2       A.    Which still require the masking, the

3    distancing, the hand hygiene, and, and other -- the

4    infection screening, I believe.

5       Q.    Right.  Okay.  And then, you know, if

6    we're -- if we're indoor, you know, obviously what we

7    see indoor, I think -- let me go find it.

8       A.    Mr. Wiest, while you're scrolling -- yeah,

9    stop -- stop right there real quick.  And if you'll

10   see, because a number of these businesses have other

11   sub-businesses within them, they're required for

12   where it's relevant to follow the requirements for

13   restaurants or the requirements for retail

14   businesses.  So a number of other documents are

15   incorporated by reference that require them for, say,

16   food concessions to adhere to the guidelines for

17   restaurants.  So there are a number of layered

18   responsibilities in this guidance document not

19   specifically delineated within the document itself.

20      Q.    Right.  And so if they've got a snack bar at

21   the zoo, that snack bar has got to comply with the

22   restaurant requirements.  If they've got a gift shop,

23   that's got to comply with the retail requirements;

24   right?

25      A.    Yes, sir.

Page 72

1      Q.   Okay.  And I -- and really I'm just looking

2    at the zoo portion of it.  Indoor -- if we've got an

3    indoor, now we're back to the 33 percent; correct?

4      A.   In this document.  I, I would offer for you,

5    since you've referenced the zoo multiple times, in

6    that instance the zoo offered a detailed plan itself

7    that very specifically identified its property and

8    the measures and steps that it would take.

9      Q.   Okay.  The -- let me -- let me ask, Doctor,

10   going back to the protests at the Capital, and I know

11   that the concern -- we talked about a thousand.  What

12   if they had 250 people, or what if they had 200

13   people in that 200,000 square feet?  Would that be a

14   problem if they were spread out?

15     A.   Well, a much smaller gathering would, would

16   lower the risk if they were spread out, because there

17   -- and again, there's multiple things.  And I'm sorry

18   to be repetitious, but in the interest of clarity --

19   but there's the density of the people, there's their

20   compliance with the other interventions, such as

21   not -- you know, not touching each other, and washing

22   their hands, sanitizing their hands, there's wearing

23   the masks.

24          Ideally there's not shouting, chanting,

25   screaming and things like that, because we've shown

1    in, in -- very clear, repeatedly, the church setting

2    being the most common but there are others, that

3    people in choir practice held together for two and a

4    half hours singing, 87 percent of the people in that

5    choir practice over two and a half hours in Arkansas

6    were infected by COVID-19.  So in those instances,

7    obviously there's risk of transmission.

8           And I've already explained, the larger the

9    group, the increased risk that there are more people

10   in that group who may have infection, expose others.

11   And I've used an analogy early in the course of this

12   response where I described it like buckshot where one

13   individual with infection exposes many others.  And

14   when they disperse, they scatter and spread

15   infection, you know, to the places they go.  But --

16   so in that context any gathering, again, represents a

17   potential risk.  But as you described it, it would be

18   considered relatively less risk if you had 20 people

19   versus 200 versus 2,000 versus 20,000.

20        Q.   Doctor, if there's a group of people on --

21   let's say it's lunch hour on the streets of

22   Louisville.  It gets a little crowded down there

23   around lunch hour, and there's, you know, a thousand

24   people going to or from lunch; is that a risky

25   scenario if they're -- if they're spread out six feet

Page 74

1    apart?

2         MR. DUKE:  I'll object.  Calls for

3    speculation.

4         A.   I would say people freely walking down a

5    city sidewalk close together still represents some

6    risk.  But it represents directionally less risk

7    because they're probably not talking or engaging with

8    each other and they're just passing in transit.  And

9    so in that case the duration of exposure between any

10   individual is, is low and, and likely to not be

11   particularly intimate or close.

12        Q.   Okay.

13        A.   I, I would say, Mr. Wiest, that will be -- a

14   different scenario would be standing on a packed

15   subway where people are in a narrow -- a closely

16   confined place with less air circulation and a dark,

17   air-conditioned environment for an extended period of

18   time.  That would be the, the other extreme relative

19   or compared to someone passing casually on a crowded

20   street.

21        Q.   Okay.  And would, would something similar be

22   public transportation on buses in Louisville, to the

23   packed subway?

24        A.   Well, I would say public -- they, they face

25   the same challenges.

Page 75

1         Q.    Okay.  We've not prohibited people from

2    using public transportation during this pandemic;

3    correct?

4         A.    I don't think so.

5              (Plaintiff's Exhibit Number 14

6              was marked for identification.)

7         Q.    We have a couple more exhibits and, Doctor,

8    I promise you we're going to get you out of here

9    early.  I think we're actually going to do that.

10             Let me share this one.  Doctor, this is the

11   sports guidance.  I realize this is not in effect

12   yet, although it is coming up.  Let me ask:  The, the

13   children -- one adult per groups of ten or, or less?

14             MR. DUKE:  I'll object to the relevance.

15             MR. WIEST:  Yeah, it's going to become

16   apparent real quick.

17   BY MR. WIEST:

18        Q.    Let me ask, and there's no limit to the

19   number of groups that can -- that can attend that

20   outdoor practice; right?

21        A.    Yeah, there's no limit stated here.

22        Q.    Part of what goes on at sports practice is

23   the coach yelling; right?

24        A.    That can happen at some -- at some sporting

25   events, yes, as far -- yes.

1          Q.    And, and part of what sometimes happens is,

2     is the student athletes can get kind of loud, too,

3     particularly at a practice; right?

4          A.    That's a possibility.

5          Q.    We don't limit how -- I realize they've got

6     to be within six feet, but the number of groups,

7     because we allow multiple groups to get together,

8     there's no limit to the number of kids that can

9     attend on a sports field or anything like that;

10    right?

11         A.    Well, it says up there, see, when you talk

12    about social distancing, right above your

13    highlighter, the guidelines for groups of ten people

14    or fewer which require -- and that incorporates the

15    social distancing expectation of six feet or more,

16    masking, so that that's all incorporated in that

17    other document.

18         Q.    Okay.  Yeah, they are -- I know that there

19    is some masking requirements, but not while they're

20    actively practicing; right?

21         A.    Right.  So when -- when they're out on the

22    field, and for -- for many of these we've had to give

23    the acknowledgment that there are certain

24    circumstances where the counterbalancing risk is not

25    accept -- you know, means you can't do it.  So we

Page 77

1    don't want people to be directly harmed wearing a

2    mask.  And an instance is where perhaps standing in

3    85-degree heat wearing a mask is certainly -- could

4    represent a safety issue, that then we are not asking

5    people to endanger themselves directly to wear the

6    mask, which is why we have taken steps to try to

7    enforce social distancing as much as possible across

8    as many different settings as we are able.

9        Q.   Okay.  My son wanted me to ask you this:

10   Are we going to have a high school fall football

11   season, Doctor?

12       A.   Can I protest myself and say we're -- calls

13   on speculation?  I --

14            MR. DUKE:  Yeah, I probably -- I'm going to

15   object but you, you can answer.  Obviously I know

16   this is in jest, but --

17       A.   Yeah.  I don't know.  Mr. Wiest, in any of

18   this it is my hope that we can -- our scientists and

19   medical experts will find some kind of vaccine,

20   treatment, or cure that will allow us to get back to

21   our normal activities as quickly as we can with the

22   least loss of human life and suffering possible so

23   that -- it's been very nice to meet you today in this

24   experience, but obviously if we were not in the

25   middle of a pandemic, you and I would not have had

Page 78

1    this opportunity.

2        Q.   I appreciate that, Doctor.  I've got a

3    couple more questions and then I think we're about

4    wrapped up.

5            MR. DUKE:  And I'm going to have a few, few

6    on cross, too, Mr. Wiest.

7            MR. WIEST:  Yeah, that's fine.

8            (Plaintiff's Exhibit Number 15

9            was marked for identification.)

10   BY MR. WIEST:

11       Q.   I'm going to show you what we've marked as

12   Exhibit 15 maybe.  All right.  Dr. Stack, is this

13   activity in violation of the mass gatherings ban,

14   that's depicted in this photo?

15           MR. DUKE:  Objection.  Calls for speculation

16   and relevance.

17       A.   So the collection of people in front there,

18   it is a large collection of -- and a public

19   collection of people that is currently prohibited

20   under the mass gathering guidance, yeah.

21       Q.   Okay.  And I'm going to show you a couple

22   more here in a minute, but is this activity that we

23   see going on in this photo endangering the public?

24       A.   The gathering increases the risk of the

25   spread of the coronavirus.

Page 79

1        Q.    Okay.  Show you just a couple more.

2        A.    And Mr. Wiest, scroll back up as long as

3    you're showing pictures here for me.  One more.

4        Q.    Yeah.

5        A.    One more -- one more, I'm sorry.  This one,

6    yeah.

7              You can visibly see in here an individual to

8    the left pulling his mask down on the left of my

9    screen.

10       Q.    Right.

11       A.    You see another individual to the right of

12   the screen not wearing a mask whatsoever, it doesn't

13   appear, or if it is, it's a bandana around their

14   neck.  You can clearly see they're not within --

15   they're not outside of six feet together.  Now, you

16   can also see others who are wearing a mask and who

17   are at least attempting to comply with that guidance.

18   I think these kinds of gatherings unfortunately are

19   just unpredictable in their nature and, and, you

20   know, that we would do our best to educate the public

21   about the risks and benefits of these types of

22   gatherings and, and then hope that we don't have

23   infection as a result.

24       Q.    No, I understand.  I have one more.  Risky,

25   I take it, for people to be touching each other?

Page 80

1          MR. DUKE:  Objection.  Speculation.

2      A.    Physical contact in the middle of a pandemic

3   is elevated risk.

4      Q.    If -- if the people in this crowd -- and

5   I'll scroll back up.  If, if they were wearing masks

6   and all standing six feet apart, would that be

7   acceptable?

8      A.    I think -- so again, Mr. Wiest, not trying

9   to be difficult, but to answer your question,

10  bringing large numbers of people together in the

11  middle of a respiratory-transmitted pandemic is

12  undesirable even if we try to reduce the risk.  If

13  these people were all to be standing six feet away

14  from each other, wearing masks, standing in the

15  outdoors, that would be a lower-risk gathering, but

16  it would not be a no-risk gathering.

17          And unfortunately, because there's a risk

18  that in such a large gathering there's almost

19  certainly some people who have the infection, in our

20  current knowledge of the state of infection in the

21  State of Kentucky.  There is risk of transmission

22  because we've even seen that highly trained,

23  qualified healthcare professionals have difficulty

24  maintaining personal protective equipment hygiene,

25  just because it's difficult, let alone in the

Page 81

1      untrained, lay public.  And so you can lower the

2      risk, which is what we are trying to do.  And you've

3      described one theoretical way it could be lowered,

4      which would be everybody to be masked, six feet apart

5      from each other.

6          Q.   Let me ask you, Doctor, can you quantify

7      that risk, the lowering if people were to be masked

8      and all standing six feet apart?

9          A.   I -- I wish I could.  I -- but I am not sure

10     that there's a mathematical model that would easily

11     allow me to do that.  And I would say that each one

12     of those measures, if you're six feet apart -- and

13     we've already talked that typically we think we spray

14     respiratory particles from our mouth about three

15     feet.  That adds a substantial margin of risk

16     reduction.  Wearing a mask further enhances that.

17     And of course, you know, following those two things

18     alone in a large gathering like this would be

19     particularly helpful.

20              MR. WIEST:  Okay.  Let me make sure -- I

21     think I am -- let me make sure.  I'm making sure Mr.

22     Bruns doesn't have, have anything for me.

23              Tom, you can jump in.  Do you have anything

24     else?

25              MR. BRUNS:  No.

Page 82

1              MR. WIEST:  Okay.  I tender the witness,

2       sir.

3              MR. DUKE:  Could we take about a five or ten

4       minute recess before we go to cross?

5              MR. WIEST:  Yeah, that's fine.

6              MR. DUKE:  Thank you.

7              MR. WIEST:  We'll just all mute.

8              MR. DUKE:  Yeah, and yeah.

9                     (Brief recess.)

10                    DIRECT EXAMINATION

11    BY MR. DUKE:

12        Q.   Thank you.  Okay.  Dr. Stack, just a few

13    follow-up questions.  Once again for the record, my

14    name is Wesley Duke.  I just want to go back.

15             Now, you -- and I think we've clarified that

16    you're the commissioner of the Kentucky Department of

17    Public Health?

18        A.   I am.

19        Q.   Do you think that in your professional

20    opinion, that the provisions on mass gatherings that

21    were put into place in the March 19th order had a

22    real and substantial relationship to the public

23    health of the Commonwealth?

24        A.   I do.

25             MR. WIEST:  Object to form.

1      Q.   Would you like to -- and what did you base

2      this decision on -- these decisions on?

3      A.   That the evidence in the early days of this

4      epidemic and at present show that when people are

5      brought together in densely confined areas, that the

6      risk of spreading the contagion is elevated.  I

7      believe we saw this in Wuhan, China and Lombardy,

8      Italy, also here domestically in New York City.

9           And there were publications from the Centers

10     for Disease Control, the World Health Organization,

11     and others that identified that mass gatherings were

12     felt to be particularly high risk.  And on the basis

13     of my observed experience -- or observing experience

14     in other parts of the world and reading from public

15     health experts in the form of WHO, CDC, and others,

16     it was felt by the public health community and myself

17     that large gatherings of people were particularly

18     high risk for spreading this dangerous infection.

19     Q.   Based on your knowledge of the science as it

20     is evolving, has anything changed that position?

21     A.   I still believe that mass gatherings are

22     elevated risk for spreading infections.

23     Q.   Now, we had talked a lot of about different

24     activity and different actions.  Would you consider a

25     trip to the grocery store to be a mass gathering?

1      A.   I do not because the nature of the trip to

2   the grocery store is fundamentally different.  At

3   least in my experience, I have generally gone to the

4   grocery store, selected the items I desired off of

5   the shelf.  Seldom do I speak to anybody during that

6   interaction.  And then I reach the checkout, which is

7   nowadays often a self checkout, though not always,

8   and so I may not interact with other people in any

9   means except to pass them in a transitory nature, you

10   know, walking down an aisle.

11      Q.   And on your -- and from your scientific

12   background and I guess your professional point of

13   view, how would you describe that difference between

14   a transitory experience and a communal experience?

15      A.   So a transitory experience has individuals

16   who are only very briefly or temporarily near each

17   other.  They often don't interact with each other

18   personally or directly.  And I already said this, but

19   just to be clear, it's a brief interaction.  So in --

20   in communal activities, and those could be any shape

21   or form where you're together with a group of people

22   over an extended period of time, you have extended

23   exposure to the same people, which increases the risk

24   if one or more of them have an infection, they may

25   spread it to you.

Page 85

1          Q.   If the -- so is it safe to say the more

2     contact there is, the higher the risk of infection of

3     COVID-19?

4          A.   Yes.

5          Q.   And the more -- for example, the more

6     talking between -- or in the vicinity of parties?

7          A.   Yes.  The exposure -- duration of exposure

8     and intensity of exposure are both two different

9     variables.  The duration of exposure is how long you

10    are in the same space or close proximity to someone

11    who has the infection.  The, the intensity of the

12    exposure would be -- you know, kissing someone who

13    has coronavirus would be a particularly high risk way

14    to acquire the infection from someone with it.

15    Talking and shouting and singing, loud

16    vocalizations -- or coughing or sneezing are, are

17    other elevated risks, though clearly not to the same,

18    you know, magnitude as kissing someone.

19         Q.   And those are, I guess to reiterate your

20    earlier testimony that those types of behavior, the

21    yelling, the shouting, the chanting, the singing, are

22    more likely to occur at a protest?

23         A.   Well, I -- I would broaden it.  I would say

24    that they're likely to occur -- more likely to occur

25    in a number of different settings.  Places where

Page 86

1    people come together specifically to sing, I would

2    say are elevated risk.  Where people come together at

3    a protest and they are shouting or chanting or

4    cheering, I would say that that's another situation

5    where there's elevated, you know, risk because you're

6    just -- you're projecting more respiratory droplets

7    with more force and for an extended period of time.

8        Q.   And in your medical opinion -- we talked

9    about, about a trip to the zoo.  Would you

10   characterize that as a transitory experience or a

11   gathering?

12       A.   I would say for the participants in the

13   zoo -- again I have to rely on my own experience, I

14   -- Mr. Wiest, I have been to many zoos in my

15   lifetime, though I have not been to the Louisville

16   Zoo, but I will strive to correct that deficiency

17   since I'm a proud Kentuckian.

18            I would say that you interact with the

19   members of your own household probably fairly

20   significantly as you go through the experience, but

21   that your interaction with most other people, other

22   than the employees where you may buy food at a

23   concession stand or buy materials in a store, that

24   most of those engagements are transitory in -- just

25   in passing in an outdoor space usually, though there

Page 87

1    are clearly indoor exhibits in some of these zoos.

2         Q.   And all of the advice and guidance that you

3    have given during the -- during the pandemic, or

4    since -- or since March 6th, since we've been under a

5    state of emergency, have those all been based on

6    basic public health principles and the science as you

7    know it?

8         A.   Yes.  I, I have used basic public health

9    knowledge and principles.  And, in fact, this is

10   particularly foundational public health in

11   recommending these sorts of nonpharmaceutical

12   interventions, as they call them, which are public

13   health distancing measures.

14        Q.   And none of your decisions have been based

15   on any personal value judgments or anything along

16   those lines?

17        A.   No, sir.  Other than that my, my goal is to

18   try to keep as many people safe as possible from this

19   infection.

20             MR. DUKE:  I think that's all the questions

21   I have.

22             MR. WIEST:  All right.  I've got a few

23   follow-ups.

24                      RECROSS-EXAMINATION

25   BY MR. WIEST:

1          Q.    Doctor, is a gathering in an office

2    conference room with 25 people a mass gathering?

3               MR. DUKE:  Object to form.

4          A.    Well, not by the definitions I told you,

5    because the, the guidelines that we're describing --

6    again, there, there is a subjective determination in

7    this based on just, you know, expert consensus, but

8    the cut points have been up to ten people, up to 50

9    people, and then gatherings over 50 or over 250.  But

10   in that context, the gathering in a conference room

11   as you just described would be a gathering but not

12   described as a mass gathering.

13         Q.    Would a hundred people at an outdoor auction

14   be a mass gathering?

15         A.    It would be a large gathering.  And I would

16   just -- I would just solve your, your questioning

17   here and just say anything over 250, I would say -- I

18   would call -- classify as a mass gathering in the

19   middle of a pandemic.

20         Q.    And so 250 -- or let's say 300 people at an

21   auction, which is permitted in an outdoor auction,

22   that is a mass gathering; right?

23         A.    I would have to say yes, that that is --

24   that is a type of a mass gathering.

25         Q.    You talked a minute ago about communal and

Page 89

1    transitory activities.  Is a communal activity --

2    would you say that 300 people at an outdoor auction

3    is a communal activity?

4              MR. DUKE:  Objection.  Speculation.

5         A.   I, I would say that in the context that I

6    was describing it, I would say 300 people coming

7    together is both a mass gathering and, because they

8    are likely to be there for an extended period of

9    time, which is the way I was using communal in, in

10   part was -- that yes, it would be a communal mass

11   gathering.

12        Q.   Is 300 people at a -- in a factory floor, is

13   that a mass gathering?

14             MR. DUKE:  Objection.  Speculation.

15        A.   I would say that it is a, a large and a mass

16   gathering by the definition.

17        Q.   Okay.

18        A.   I would say that in my assessment of these

19   different circumstances though, and you'll recall

20   that I have identified that I'm trying to weigh risks

21   and benefits, we have in our guidance where we've

22   made these exceptions, identified circumstances where

23   we felt they were essential or life-sustaining

24   services.

25             And so for -- obviously I, I can't classify

Page 90

1      an auction as a life-sustaining or essential service,

2      but -- but factories, places generating energy,

3      places providing food and shelter, those would be

4      examples of areas where the counterbalancing human

5      need for the services provided has been a

6      consideration where, you know, under which we have

7      permitted activities we otherwise generally would not

8      have preferred to grant.

9           Q.   And so there was a value judgment that those

10     life-sustaining activities needed to go on; correct?

11               MR. DUKE:  Objection.  Speculation.

12          A.   So there was an attempt to weigh those --

13     those particular activities that were necessary that

14     support, you know, essential functions for human --

15     you know, regular human maintenance and survival.

16          Q.   Right.  When you -- when you say benefits of

17     life-sustaining activities, you're making a value

18     judgment that they need to continue to occur; right?

19          A.   Mr. Wiest --

20               MR. DUKE:  Objection.  I'm going to object

21     to the form of that question.

22          A.   Mr. Wiest, I'm going to strive to give you

23     an answer here, but when you say a value judgment,

24     I'm making a weighted risk-benefit analysis for, for

25     where there appear to be benefits that counterbalance

Page 91

1    the risks that are incurred because overall, like

2    I've said, I'm trying to reduce risk as much as

3    possible.  And where risk has to be accepted, trying

4    to find instances where, where the reason for

5    accepting it is, is necessary to, you know, human

6    activity.

7         Q.   Well, let me use a synonym of value.

8    Another synonym of value is, is something's

9    important.

10             You're determining that something -- that

11   life-sustaining activities are important enough to

12   where they have to continue to occur; right?

13             MR. DUKE:  I'm going to -- objection.  The

14   witness has, has answered the question.

15             MR. WIEST:  He has not answered.  If he

16   would, I'd move on.

17        A.   Yeah, I would say that they are important

18   activities.

19   BY MR. WIEST:

20        Q.   And you've determined that outdoor auctions

21   are important enough to continue to go on, even

22   though there's potentially large crowds and

23   potentially people shouting back and forth; correct?

24             MR. DUKE:  Objection.  Asked and answered.

25        A.   All right.  So Mr. Wiest, again, in that

Page 92

1    context I have tried to be as precise as I'm able to,

2    that there are complex analyses.  So in that

3    environment, there's the possibility of constraining

4    variables more reliably than there are in other

5    situations.

6            And I -- and I do not purport to say that

7    each of these is without risk, but where we can

8    constrain variables to lower the risk as much as

9    reasonably possible, some of those activities are

10   being permitted as part of the phased reopening of

11   activities, which is, you know, in compliance with

12   the general guidelines outlined nationally.

13           And so those activities, an auction, were

14   not permitted in phase one.  And now, as we are in

15   phase two and we enter phase three, those and other

16   activities will be permitted pursuant to certain

17   guidances to try to reduce risk in these increasingly

18   risky environments, outdoor activities being

19   permitted.

20       Q.   Doctor, your orders don't ban, say, 50

21   people in a typical office environment from attending

22   a retirement party during working hours; right?

23           MR. DUKE:  Objection.  Form.

24       A.   It, it does not ban that 50 people could get

25   together, to the best of my recollection.  But it

1    places significant restrictions.  So, so common

2    gathering areas, cafeterias, communal areas, all of

3    those areas have been very explicitly in most of

4    these guidances declared to be undesirable, if not

5    strongly discouraged or prohibited.  And people are

6    encouraged to not congregate in any area, you know,

7    within the building.

8           So I -- what I would say is you are correct,

9    we have not explicitly prohibited a gathering of up

10   to 50 people in an office environment, but we have

11   given substantial additional guidance as to how that

12   activity should occur if it is to occur.

13   Q.    Okay.  There would be nothing that would

14   keep you from giving guidance on -- and I know

15   California just did this, I'm not sure if you're

16   aware of it -- on conducting protest activities;

17   right?

18   A.    Mr. Wiest, as we go forward to phase three,

19   in any of these phases it has not -- how to say this,

20   sir.  We are going to -- as long as we don't have a

21   massive resurgence of infection, we are going to

22   permit progressively larger gatherings over time, of

23   which protest is just one form and shape.  And at --

24   those are likely to be included in some future

25   guidance, if not by explicit inclusion then because

Page 94

1    they are part of a general order for how gatherings

2    of a certain size may occur and under what

3    situations.

4         Q.   Let me ask:  Right now, Doctor, the state of

5    affairs is that there's -- there's a ban on

6    gatherings of more than ten people unless it's in

7    some other activity that we've looked at, restaurants

8    perhaps or auctions and things like that; right?

9    That's the current state of affairs?

10        A.   Yes, sir.

11        Q.   When we look at the Capital lawn, the

12   200,000 square feet, if you had to put a number on

13   the number of people if they were to be spread out

14   that could safely gather there -- or maybe not

15   safely, but create a medium or a low risk, what

16   number would you put on it?

17             MR. DUKE:  Objection.  Calls for speculation

18   and I believe we -- I believe this was asked and

19   answered earlier.

20        A.   So Mr. Wiest, I would say you could

21   obviously hold substantially more people in a space

22   like that with, with a six-foot perimeter around all

23   of them.  So obviously that outdoor space could,

24   could hold people standing in their confined space, a

25   great deal many more than could happen in an office

Page 95

1    space or other confined area.

2         Q.   Well, and Doctor, I'm just -- is it -- if

3    you -- if you were looking to a group of protestors

4    that said to you, Doctor, we would like to do this,

5    we recognize this is not a risk-free proposition --

6              MR. DUKE:  Objection to form.

7         Q.   We -- but we want to go and conduct a

8    protest in person at the Capital, tell us how to

9    minimize risk.  We're going to distance, we're going

10   to wear masks.  How many of us would make it a medium

11   or low risk proposition?  What would your answer be?

12        A.   My answer today would be that gatherings of

13   that sort are not permissible until June 29th or

14   later, when we enter phase three, because that has

15   been the general guidance we have given for other

16   gatherings.  Now, after June 29th, as we give

17   additional guidance for some of these larger events,

18   that will help inform how others can, you know,

19   comply with and participate in ways that we are

20   hoping will mitigate risk.

21             But I have said repeatedly throughout our,

22   our meeting this afternoon that all of these

23   gatherings entail risk in the middle of a pandemic.

24   From a public health standpoint, which is the primary

25   lens, you know, that I try to weigh the advice that I

Page 96

1      offer in this, in this pandemic, they are not

2      desirable.  And, and the best we can do is offer

3      guidance for how people can reduce the risk of

4      spreading contagion, and so we will continue to do

5      that.

6              The risks earlier in this -- the, the risk

7      of the disease has not reduced, unfortunately.  But

8      the, the growing knowledge base is helping us

9      hopefully to gain more experience and tailor our

10      recommendations to permit more human activities in a

11      reduced-risk manner.  So we -- it is clearly a very

12      steep learning curve with a pathogen we've never

13      experienced before.

14      Q.   So in terms of -- and I realize, Doctor,

15      that, you know, we're not permitting it today, but in

16      terms of risk reduction, what you could offer today

17      is if, if these people are going to do it anyways and

18      violate the orders, for public health purposes, six

19      feet apart and wearing a mask is your recommendation

20      at this point?

21              MR. DUKE:  Object to form.

22      A.    Well, Mr. Wiest, my -- so my, my scope and

23      my role is public health.  My recommendation is that

24      the activity not occur.

25      Q.    Right.

Page 97

1          A.   Others have different responsibilities in

2     society and will determine, you know, how and when

3     and where, you know, the activities are enforced or

4     not.  And there is a lot of inputs that could go into

5     those decisions.  But for my purposes, I would -- I

6     continue to recommend that large mass gatherings are

7     an elevated risk of spreading this infection and that

8     that is not in the best public health interest both

9     at the community level or at the individual level.

10         Q.   Okay.  And, and just to be clear, your

11    definition of large mass gatherings is the 250 or

12    more?

13         A.   I'm, I'm using that by reference because

14    that's the federal documents, yes.

15         Q.   Right.  That comes from the CDC; right?  It

16    defines large mass gatherings as 250 or more; right?

17         A.   They've used that in a number of documents.

18              MR. WIEST:  Okay.  Let me just check, I may

19    be done.  Let me just check.  All right.  Doctor, I'm

20    done.

21              THE WITNESS:  Thank you, Mr. Wiest.

22              MR. DUKE:  I have one -- I've got one

23    follow-up, one or two follow-ups, Chris, if you'll

24    let me.  I think just to clear something up, if you

25    don't mind.

Page 98

1          MR. WIEST:  Yeah.

2                    REDIRECT EXAMINATION

3    BY MR. DUKE:

4          Q.   Dr. Stack, there is a -- there, there have

5    been certain industries and businesses that have been

6    designated as critical by the federal government; is

7    that correct?

8          A.   There is actually a, an explicit list that

9    an agency of the federal government has defined and

10   which is referenced in our documents.  I can't

11   remember the agency, but it is -- it is publicly

12   available, that describes essential infrastructure

13   and businesses, yes.

14         Q.   And that list was taken into consideration

15   and played a part in all of our documents?

16         A.   Yes.  I, I personally looked at it, though I

17   can't recall the detail, but I looked at it as part

18   of this.

19             MR. DUKE:  That's all I have.

20                    FURTHER CROSS-EXAMINATION

21   BY MR. WIEST:

22         Q.   Doctor, just to clarify, you're talking

23   about the CISA, critical infrastructure sector list?

24         A.   Yes, sir.

25         Q.   Okay.

Page 99

1          A.    The, the document and that work product,

2     yes.

3               MR. WIEST:  Okay.  That's all I've got.

4               MR. DUKE:  Thank you all.

5               MR. WIEST:  Are you reading?  You've got to

6     tell the court reporter, are you guys going to read?

7               MR. DUKE:  Pardon?

8               MR. WIEST:  Are you guys going to read?

9               MR. DUKE:  No.  We'll --

10              MR. WIEST:  Okay.

11              MR. DUKE:  Video's fine.

12              MR. WIEST:  We're done.

13

14                    (Witness excused.)

15              (Deposition concluded at 4:36 p.m.)

16

17

18

19

      (SIGNATURE WAIVED.)
20     _____        _____

21     STEVEN STACK, M.D.                     DATE

22

23

24

25

Page 100

```
 1                                    )
      COMMONWEALTH OF KENTUCKY        )
 2                                    )

 3

 4            I, Lee Ann Goff, Notary Public in and for the

 5   Commonwealth of Kentucky, do hereby certify:

 6            That the witness named in the deposition,

 7   prior to being examined, was by me duly sworn;

 8            That said deposition was taken before me at

 9   the time and place therein set forth and was taken down

10   by me in shorthand and thereafter transcribed into

11   typewriting under my direction and supervision;

12            That said deposition is a true record of the

13   testimony given by the witness and of all objections

14   made at the time of the examination.

15            I further certify that I am neither counsel

16   for nor related to any party to said action, nor in any

17   way interested in the outcome thereof.

18            IN WITNESS WHEREOF I have subscribed my name

19   and affixed my seal this 15th day of June, 2020.

20

21                         _____

22                         Lee Ann Goff

23                         Notary Public 580909

24

25   My Commission Expires:  7/1/21
```